J-A29045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.L.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| R.P.S., JR., | : | |
| | : | |
| Appellant | : | No. 816 WDA 2016 |

Appeal from the Order entered May 4, 2016
in the Court of Common Pleas of Armstrong County,
Civil Division, No(s): 2011-1474-Civil

BEFORE: DUBOW, MOULTON and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED DECEMBER 19, 2016**

R.P.S., Jr. ("Father"), appeals from the May 4, 2016 Custody Order that denied Father's request for shared custody, which was entered following Father's Petition for Modification of the December 5, 2012 Custody Order that granted J.L.S. ("Mother") primary physical custody of their daughters, F., born in June 2003, and G., born in June 2002 (collectively, "Children"). We affirm.

In its Opinion, the trial court set forth the underlying facts, which we adopt for the purpose of this appeal. *See* Trial Court Opinion, 5/4/16, at 2-25.

Relevantly, Father and Mother were married in 2002, after living together for an unspecified period of time. Mother filed a Complaint in Divorce in September 2011, which included a claim for temporary physical custody of Children, pending the final hearing. At a Conciliation Conference

in December 2011, Father and Mother agreed to a temporary physical custody arrangement. On December 5, 2011, the trial court entered a Custody Order, granting Mother and Father shared legal custody, and granting Mother primary physical custody of Children. On October 20, 2014, Father filed a Petition for Modification of Custody, seeking "to expand his custodial time." On May 4, 2016, the trial court entered a Custody Order granting Mother and Father shared legal custody, and granting Mother primary physical custody of Children. The Custody Order denied Father's request for shared physical custody of Children, and modified portions of the December 5, 2012 Custody Order. Relevant to this appeal, the May 4, 2016 Custody Order provides that Father's partial physical custody of F. may begin when F.'s individual therapist indicates that F. is ready.

Father filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement.[1]

On appeal, Father raises the following questions for our review:

> I. Did the trial court err in finding that the best interest[s] of [Children] was for Father to have less custodial time than he had in the previous Order?

---

[1] We note that although Father's Concise Statement identifies six issues for appeal, the Questions Presented section of his brief identifies only three issues, and the wording of those issues differs from the wording used in the Concise Statement. In the Summary of the Argument section of his brief, Father identifies all six issues, and indicates that the six issues "can be consolidated into three areas of error on behalf of the trial court." Father's Brief at 4. Because the Argument section of his brief includes a discussion of all six issues identified in his Concise Statement, we will consider Father's claims on appeal.

II. Did the trial court err in applying the sixteen factors set forth in [section] 5328 of the [Child Custody Act ("Act")[2]]?

III. Did the trial court err in rendering decisions not supported by the weight of the evidence and findings of record?

Father's Brief at 2. We will address Father's issues together.

> We review a trial court's determination in a custody case for an abuse of discretion, and our scope of review is broad. Because we cannot make independent factual determinations, we must accept the findings of the trial court that are supported by the evidence. We defer to the trial [court] regarding credibility and the weight of the evidence. The trial [court]'s deductions or inferences from its factual findings, however, do not bind this Court. We may reject the trial court's conclusions only if they involve an error of law or are unreasonable in light of its factual findings.

*C.A.J. v. D.S.M.*, 136 A.3d 504, 506-07 (Pa. Super. 2016) (citation omitted). Additionally,

> [t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

Father claims that the trial court erred in finding that it is in the best interests of Children for Father to have less custodial time. Father's Brief at 5. Father argues that the trial court erred in applying the sixteen factors set forth in section 5328 of the Act. *Id.* at 6. Specifically, Father challenges the

---

[2] *See* 23 Pa.C.S.A. §§ 5321 *et seq.*

trial court's findings under subsections (4), (6), (7), (10), (14) and (16). *Id.*

In regard to subsection (4), Father asserts that the trial court failed to consider the stability that F. had since 2014, under the terms of the prior Custody Order. *Id.* Father also argues that the trial court failed to explain how the requirement that F.'s therapist indicate when she is ready to continue with the custody arrangement will promote continuity or stability. *Id.* at 6-7.

In regard to subsection (6), Father claims that the trial court "failed to consider the testimony of the court evaluator, and the parties' testimony that the individual therapist of [F.] recommended that [F.] be gradually eased into spending more time with Father…." *Id.* at 8. Father contends that, therefore, the trial court's decision is against the weight of the evidence. *Id.* at 9.

In regard to subsection (7), Father argues that the trial court's determination that F. "is not mature enough to make that decision" (regarding her preference to live with Father half of the time) is against the weight of the evidence because F.'s therapist and the court evaluator concluded that F. could be eased into the shared custody arrangement. *Id.*

In regard to subsection (9), Father asserts that there is no evidence to support the trial court's finding that this factor weighs in favor of Mother

because "[t]here appears to be cadre of young adults at Father's house who like to party while [] Children are around." *Id.*

In regard to subsection (10), Father argues that the trial court's finding that Mother is more likely to "attend to the daily physical, emotional, developmental, education and special needs" of Children is against the weight of the evidence. *Id.* at 10. Father states that he testified during the two-day trial that he is not opposed to counseling for Children or himself. *Id.* at 10-11.

In regard to subsection (14), Father claims that the trial court's finding is against the weight of the evidence, as the trial court found that Father has an alcohol problem based solely on Mother's testimony. *Id.* at 11. Additionally, Father asserts that G. was concerned about alcohol use by someone else in Father's household, rather than by Father. *Id.* at 12.

In regard to subsection (16), Father contends that the trial court ignored the court evaluator's recommendations, and provided no reason for doing so on the record. *Id.*

In any custody case decided under the Act, the paramount concern is the best interests of the child. *See* 23 Pa.C.S.A. §§ 5328, 5338; *see also E.D. v. M.P.*, 33 A.3d 73, 79 (Pa. Super. 2011). Section 5328(a) provides as follows:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all

relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, education and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328; *see also C.A.J.*, 136 A.3d at 509-10.

"All of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis omitted). Moreover, section 5323(d) mandates that, when the trial court awards custody, it "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). The trial court may not merely rely upon conclusory assertions regarding its consideration of the section 5328(a) factors in entering an order affecting custody. *M.E.V. v. F.P.W.*, 100 A.3d 670, 681 (Pa. Super. 2014). However, "[i]n expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations."

***A.V. v. S.T.***, 87 A.3d 818, 823 (Pa. Super. 2014) (citation and quotation marks omitted).

In its Opinion, the trial court undertook an analysis of the section 5328(a) factors, and concluded that "it is in Children's best interests to live primarily with Mother." ***See*** Trial Court Opinion, 5/4/16, at 25-33. Father's arguments would require this Court to reassess and reweigh the evidence in Father's favor. However, "with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge[,] who presided over the proceedings and thus viewed the witnesses first hand." ***E.D.***, 33 A.3d at 76; ***see also C.A.J.***, 136 A.3d at 506 (stating that "[w]e defer to the trial [court] regarding credibility and the weight of the evidence."). Although Father is not satisfied with the weight that the trial court afforded to many of the statutory factors in rendering its custody decision, our review of the record reveal that the trial court's findings of fact are thoroughly supported by the record. ***See C.A.J.***, 136 A.3d at 506 (stating that this Court cannot reweigh the evidence supporting the trial court's determinations so long as there is evidence to support the findings). Therefore, we conclude that the trial court did not abuse its discretion, and we defer to its custody decision. ***See id.***

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/19/2016

IN THE COURT OF COMMON PLEAS OF ARMSTRONG COUNTY, PENNSYLVANIA

J██████ L. S████████,                     :
                        Plaintiff         :
                                          :
            v.                            :         No. 2011-1474-CIVIL
                                          :
R██████ P. S████████,                     :
                        Defendant         :

## MEMORANDUM AND ORDER

EXHIBIT

A

2016 MAY -4 AM 10:44

Certified from the Record
this ___ day of _____, 20__ A.D.

Brenda C. George,
Prothonotary and Clerk of Courts
Armstrong County, Pennsylvania

MY COMM. EXPIRES 1ST
MON. JAN. 2020

L. Zienkulu, Esq. 5 4-11
J. Lewis, Esq. @ 10:55 AM

IN THE COURT OF COMMON PLEAS OF ARMSTRONG COUNTY, PENNSYLVANIA

J█████ L. S█████████, :
                          Plaintiff    :
                                       :
            v.                         :      No. 2011-1474-CIVIL
                                       :
R█████ P. S█████████,                  :
                          Defendant    :

## MEMORANDUM

PANCHIK, J.

Before the Court for disposition is defendant R█████ P. S█████'s ("Father's") October 20, 2014 petition for modification of the December 5, 2012 custody order granting J█████ L. S█████ ("Mother") primary physical custody of F█████████████, born June 23, 2003, and G█████████ █████, born June 6, 2002, (collectively the "Children").

Trial began July 20, 2015 with Father's testimony. The Court then suggested that the parties and Children be evaluated by a psychologist and a custody report (the "report") prepared for the Court. The Court continued the trial 120 days for that purpose. Custody evaluator Martin Meyer, Ph.D., then submitted a report to the Court. The custody trial resumed and was completed March 18, 2016. The matter is now ripe for decision. For the reasons that follow, we will grant Mother primary physical custody of the Children, and Father partial physical custody, in accordance with the accompanying order.

## FACTS



After reviewing the record, the Court makes the following findings of fact.

Mother and Father lived together for an unspecified period of time prior to marriage. They married in 2002, separated in 2011 and were divorced in 2013.

Father and Mother live a three-to-five minute drive from one other.

Father, 43, lives with his paramour, W███ S██████████, and W████'s two adult children, D████, 20, and A████ 19.[1] They have lived together in a house in Dayton, Armstrong County for approximately three years. The house has seven bedrooms. Everyone has his own room.

Father has two children from a previous relationship: C██████, 23, and A███████, 19. They do not live with him.

Father is a high school graduate. He received special education for reading and learning problems from first through ninth grades. Father noted that the Children also have learning problems. Father served in the U.S. Marine Corps and received an honorable discharge.

---

[1] Mother contended that D████ and A███ also have their paramours living with them in the house.

Father's mother worked as a secretary and his father was a butcher.

Father works as a foreman at Rosebud Mining Company. He has worked there for 11 years. Father works 4 a.m. to 2 p.m. or 2 p.m. to 11 p.m. Monday through Friday. On occasion, Father also works Saturday. When he works the morning shift, he gets up at 3 a.m. and returns home at 3 p.m. For the later shift, Father leaves the house at noon and gets home at midnight. Father can be reached in the mine where he works by landline telephone.

If Father is granted more time with the Children during the week, he will see them for forty-five minutes when he works the afternoon shift. When Father works the daylight shift, he will see the girls after they come home from school.

At the time he testified, Father had partial custody of the Children on Wednesday from 4 p.m. to 8 p.m. and every other weekend from 4 p.m. Friday to 8 p.m Sunday. Father testified that previously, Mother was more flexible about giving Father more time than the custody order called for. Father would text Mother and ask for more time with the Children and Mother would permit it. Father was getting the Children every weekend. That stopped the day that Father asked Mother for fifty/fifty custody. Mother said no, she did not think that was

3



a good idea.  Father still wishes to have at least F██ fifty percent of the time.

Exchanges take place with Father picking up and dropping off the Children.  Meyer, at 18.  Father does not interact with Mother.  Father told Meyer in mid-2015 that if a problem arose, it was solved via text messages or by meeting in person. Meyers Report, at 18.  Father said there was a "mild level of hostility between he and [Mother]" and said this included a strong expression of dislike.  Father admitted that he had talked to the Children regarding the custody situation.

F██ and G██ both attend West Shamokin High School. G██ is in 8th grade and F██ is in 7th grade.  Father testified that if he is granted custody of the Children during the week, either W██ or Paternal Grandmother will put them on the school bus in the morning.

Father described Mother as a good parent and said that their marital problems began when Mother started school.  Father said he was depressed during their relationship and argued with Mother. Meyer Report, at 15.  Father stated that Mother did not attempt to change.  The parties were arguing.  Mother wanted a divorce; Father did not.  Mother then called 911 and said Father had hit her.  Mother obtained a PFA against him. Id.

4

Father said he had no concerns regarding Mother's parenting abilities and there are no disagreements between them regarding education, religion, athletic/recreational experiences and special interests. Father believes that F████ would benefit from speech services and told Meyer that both Children need medication for focusing. Meyer Report, at 17.

Father said he believed that Mother would say Father is inadequate or incompetent to care for the Children and that Father uses alcohol excessively. Meyer Report, at 15. Father said Mother thinks he is not responsible. Id.

Father is a Christian. He feels that religion is an important influence on the Children's lives.

According to Father, F████ and G████ have a love/hate relationship with each other "minute by minute." Separating the two is in their best interests. The Children need time apart and time together, Father said. He wants what the Children want. They should make their own decisions about where to live. Father said that F████ is better away from G████.

Paternal Grandmother lives two or three hundred yards away from Father's house, as do two siblings of Father. They are available to help with the Children. W████ works for Paternal Grandmother at a care home located two or three hundred yards away. F████ and G████ both play softball and F████ is in

5

the marching band.  The Children also are involved in the 4-H

Club.  Father can get the Children to their activities by

himself with the help of his family and Wendy.

The girls need adult supervision when they are at

home.  Wendy watches them when Father is at work.  The Children

get along "great" with Wendy, according to Father.

The Children are in good physical health.  However,

they have serious emotional problems.

Father testified that G█████ will not come over to his

house because of an incident involving a babysitter.  The

Pennsylvania State Police and Armstrong County's Children, Youth

and Family Services were called in to find out what had

happened.

After the incident, G█████ began to have individual

therapy.  Although joint counseling was recommended, Father

resisted participating in counseling with G█████  First, he did

not believe that the incident described by G█████ actually

occurred.  Secondly, he does not believe in counseling.  "I

believe counseling is not the answer to anything," Father

testified. "I think counseling is useless sometimes."  He said

people just "have to work things out."

Father has had serious mental health problems himself.

He began to have depression in 2009 when he felt neglected by

6

 
Mother. Meyer Report, at 15. Father also suffered from anxiety in 2009, feeling jittery and having tachycardia. Father was involuntarily committed to a psychiatric ward in 2010 when he threatened to commit suicide. As a result, Father went to individual therapy and took psych medication. Father stopped taking medication after a short time. Father said that he did had therapy for a year, although Mother said he only had therapy for a short time. Father testified that he stopped because his therapist and doctor said he no longer needed counseling or medication. However, Father did not give this reason for stopping to Meyer.

With respect to his alcohol intake, Father testified that he drinks a case of beer per week, maybe a case every two weeks. Father then testified that he only drinks two cases of beer per month. Father denied drinking 15 beers a day. He said he outgrew that "a long time ago." Father noted that he had no arrests and no work missed because of drinking. At trial, Father said he had passed a drug and alcohol test at work. The test was taken July 14, 2015. See Exhibit 2. Father also had a drug and alcohol evaluation done November 13, 2015 because of Meyer's recommendation that Father do so. This evaluation, made at The Open Door, stated that "[b]ased on the information you provided during your assessment, it is the recommendation of the

7


treatment team at this time that you do not meet criteria for outpatient treatment." Ex. 1. The report further stated, "It is important for the Court and legal counselor or any other parties to note that **the findings of The Open Door are highly dependent** on the **extent** and **veracity** of the **reports** made by the **individual**." Id. (emphasis added.)

Father does not believe that his drinking led to his divorce from Mother.

According to Father, his paramour drinks only occasionally. Father also said that "G⬛⬛ does not object to drinking." G⬛⬛ has contradicted that assertion.

Mother takes the Children to the doctor and dentist. According to Father, Mother does not tell Father what happens at those visits.

Father does not receive a schedule of the Children's softball games. He said he only finds out there is a game when he gets a text from Mother the day of the game. Father would like Mother to keep him more informed.

Father believes that the camps the Children go to are good for them. They help the Children to make new friends.

Father asserted that Mother screens Father's calls to the Children. Father said he used to text the girls every day or every other day. However, Mother got the girls new cell

phones for Christmas of 2015. As a result, Father said, Mother can now read everyone's texts. Because the texts are no longer private, Father no longer texts the Children.

In the last year, G████ has not come to Father's house as often as F███ has. Father has tried to talk to G████ about it face to face and via text. However, G████ will not text him or talk to him. The last time G████ stayed overnight was Easter 2015, when she stayed from Saturday to Sunday. Things went quite well that weekend, according to Father.

If the Court grants Father equal physical custody of the Children, he will introduce the Children to the expanded time with him slowly. However, Father would not force G████ to come to his house right away, since she is the one having problems with him. Father said he would have F████ come over more right away, since that is what she wants.

Mother, 43, lives in a house in Dayton, Armstrong County with G████, F████ J████ W████████, 16, and M████ W████████, 18. J████ and M███ are children from Mother's previous marriage. The house was the partys' marital residence. The Children have not primarily resided anywhere else.

Mother has been a certified nurse practitioner since 2012. She works in the emergency room of Armstrong County·



Memorial Hospital.   Mother works three eight-hour shifts one week and four eight-hour shifts the next.

Mother and the Children are Presbyterian.   Mother told Meyer that the religion is an important influence in the Children's lives.

Maternal Grandmother and Maternal Grandfather, M███ J███ and T███ G███, are dairy farmers on the family farm. Mother is close to her parents.

Mother reported to Meyer that in 2010, Father held a pistol to his head and she was concerned for him and as well as for herself.   Father signed himself into the psychiatric ward and the parties separated for four months.   Father received medication and therapy, but became agitated when he stop taking his medication.   Mother told Meyer that Father was physically intimidating to her and emotionally abusive during their relationship.   In the summer of 2011, Father shoved Mother and kicked in a door.   In 2011, Mother obtained a one-year Protection from Abuse order against Father because of what she termed his hostility, aggression, suicidal threats and physical intimidation.

According to Mother, Father is an alcoholic.   He has a long history of daily alcohol abuse.   Father has tried to quit but failed many times.   He even attended AA in the past.   Mother

10

told Meyer that Father sometimes left her for months at a time on alcoholic binges. Mother has known Father to consume 12 beers in one or two hours. When Father drinks, he becomes hostile and angry.

Mother told Meyer that Father associates with people with the same alcoholic behavior and has been known to become increasingly hostile and aggressive with the Children when drinking, especially when drunk or hungover. Father has also left the Children in the care of questionable individuals.

According to Meyer, Mother has found Father and his girlfriend texting disparaging comments about Mother to F▓▓▓ and discussing custody matters with her.

Mother stated that she did not typically discuss or disclose custody information with the Children unless she needed to take them to something like a conciliation or hearing. It is her belief that both Father and his girlfriend regularly discuss custody matters with F▓▓▓.

Mother said both girls have "experienced episodes of not wanting to go to their dad's." F▓▓▓ has maintained the schedule but G▓▓▓ has refused to go. The visitations have interfered with the relationship between G▓▓▓ and her sister. F▓▓▓ eventually reduced her visits, with Father admitting later that it was because F▓▓▓ wanted to spend more time with Mother.

11

Meyer Report, at 11. F███ uses visitation as a weapon to get her way and is not mature enough to decide where she should stay, Mother said.

Mother also told Meyer that she has "concerns that [Father] lives in a cabin with his girlfriend and two of her adult children, who also have partners[.] [Mother related,] '[I]t is my understanding that they regularly engage in keg parties and smoke pot.'" Id. Mother said that the adult children and their partners "regularly care for the girls." Id. at 13.

Father subpoenaed F███ for the first scheduled trial, but not G████ He also took F███ to his attorney's office. Father's different treatment of the Children resulted in increased discord between F███ and G████

G████ and F███ have both been diagnosed with Attention Deficit Hyperactivity Disorder. Father does not believe this is a valid diagnosis. According to Mother, he has refused to regularly give them their medication.

The Children have learning difficulties and they both engage in lying behavior.

G███ has been diagnosed with anxiety. She is avoidant and has difficulty making friends. She made a homicidal threat toward her teacher during the fifth grade and



was expelled for three days.  Mother told Meyer about the
following problems involving G███:

> In December of 2011, the father had gone to a
> Christmas party and G███ wanted to leave, at which
> time her brother and a cousin threw her down steps.
> Father had passed out drunk and "became belligerent"
> when asked to get up.  In 2012, G████'s anxiety
> increased and she became physically aggressive with
> her mother.  Counseling was recommended but father
> refused for her to receive such.  At one point in
> 2012, when suicidal and homicidal, [G███] threatened
> to cut her mother's hair off and stab her in her
> sleep.  She said if she was forced to go to her
> father's, she would kill him, and G███ eventually
> stopped seeing him.  * * *  Other incidents between
> 2012-2013 involve their father leaving the children
> with female babysitters who then had a party with
> beer, hid the children's phones and jumped on G███ at
> 2:00am.  G███ was again left with a teenager who
> filmed G███ and threatened to publish pictures of
> her.  G███ then threatened to stab them.  In the fall
> of 2012, J█████ was in possession of G███ in a
> vehicle while G███ was agitated, and she threatened
> to jump from the car because she did not want to go to
> her father's home.

Meyer Report, at 5.

Father said he did not see G████'s anxiety, suicidal
and homicidal thoughts and aggressive behavior when G███ was
with him.  He called G███'s behavior "typical temper tantrums."
Mother regularly told Father about G███'s problems, but in 2012
Father "made it clear it was not his problem and he wanted

13

nothing to do with it," Mother testified.[2] Mother thought G█████ needed counseling, but Father was reluctant to agree. He denied that G████ had a problem or needed treatment. Father finally consented to G████ seeing a therapist at the end of November 2012. Father took eight weeks to sign the necessary paperwork and the signing had to be accomplished through the parties' attorneys.

It also took nearly two months to get Father's consent for F████ to get counseling, Mother said. Father has also opposed counseling for himself. He does not feel that counseling is useful. He has called it "hogwash."

F████ went into G████'s sessions with her for a while before getting her own therapist. Father would not consent until he was assured that Mother was not a part of the counseling. It was recommended that Father and G████ do some counseling together. However, only after Meyer issued his report did Father, through his attorney, contact G████'s therapist and ask for therapy with G████.

G████ reported an incident at Father's house involving a babysitter and the babysitter's boyfriend. G████ said they videotaped her dancing with a bear. They then forced her to

---

[2] Father denied ever saying this.

 
dance in a sexual manner with a baseball bat. Father sided with the babysitter. G████ exhibited increasing anxiety and made threats to hurt herself and others.

G████ was prescribed Selexa for anxiety as well as medication for her ADHD. At G███'s request, she was weaned off the medication in 2015 because she was doing so well. G████ wanted to stop her counseling, but Mother and G███'s therapist recommended against it.

G████ has made progress in counseling. Mother reported that at the time of trial, G███'s anxiety was "minimal" and she had not made any threats to hurt herself or anyone else.

According to Mother, G███'s visits to Father's house declined significantly in 2014. G████ would get anxious on some visits and "we'd let her come home early. Sometimes F████ would stay with Father." This occurred 15 to 20 times. G███'s visits to Father were practically nonexistent in 2015. G████ went over there once.

In early 2015, Melissa McKee, the girls' therapist, recommended that F████ begin to see Father "gradually." However, Mother has not taken F████ to Father's house more because "the behavior of F████ is a problem in the current setup," Mother said. G███'s "relationship with F████ gets

15



worse the more they are separated." When E⬛⬛ initially comes back from Father's house, "all her bad behaviors and emotions are at their peak," according to Mother. "Then she calms down and eventually is a nicer person." McKee and Meyer are recommending a gradual increase in time with Father "whenever the girls can consistently improve in their individual behavior and in their relationship," Mother said.

G⬛⬛ has not spent the night at Father's house in 2016. She will not go. G⬛⬛ says she does not like it out there. "I speculate that she doesn't feel safe," Mother said. "She shuts down when I try to discuss it." G⬛⬛ is unable to verbalize her feelings about the matter.

G⬛⬛ last visited Father's house on March 15, 2016 for four hours. Her behavior deteriorated. Her anxiety spiraled and she had a panic attack. The Children were fighting and Mother had to separate them for the night.

The relationship between G⬛⬛ and F⬛⬛ is still a serious problem. "It's beyond sibling rivalry," Mother said. "It's an adversarial relationship." Mother said "[t]here isn't a day they're not screaming and yelling at each other." They have come to blows. "F⬛⬛ has developed a real dislike of G⬛⬛." F⬛⬛ refuses to touch anything or anyone that G⬛⬛ has touched.



The hostility between the sisters is most noticeable when F███ returns home from Father's house. G████'s anxiety escalates and the two girls fight.

At the time of trial, each girl was having individual therapy once a month. Therapist Melissa McKee sees G████ and F████ together for the last half hour of the session.

In the summer of 2015, Mother and Father did a trial run of F████ going back and forth week on and week off. It was an "utter failure," Mother said. "It negatively affected the feuding between the two girls." Mother noted that once the weekabouts stopped in the fall, G████ and F████'s relationship "changed and got better." However, the relationship is "still an issue. It's not consistently good." F████ is taking Concerta for ADHD. She actually requested it for herself for school, Mother said. The medication has helped.

Mother said she finds it "very concerning to split [up] the girls." Her concern is that separating the Children more "will further exacerbate the [acrimonious] relationship between the girls." Mother said the problems between G████ and F████ puts a strain on her entire family, including her two older stepchildren.

Mother said it is in the best interests of the Children that there be no change in the amount of time that

17

Father has each child. "There is even stress in the present schedule," Mother said. G████ should not be forced to see Father at all in the present situation.

Meyer interviewed W███ S████████, Father's paramour, and elicited the following information. S████████, age 41, graduated from high school with average grades. She attended business school and became certified as a medical assistant in 1994. Semanovich was previously married and has three children: an 18-year-old daughter and two sons, ages 20 and 21. She and Father have lived together more than two and a half years. Semanovich has been employed at Back to Basics since 2013. She denied any medical problems, physical limitations or mental or emotional difficulties. She said she has no history of drug or alcohol abuse and has no criminal history.

Meyer observed the Children separately and together at Mother's house. When the girls were together, G████ told Meyer that she enjoys cooking. F████ also reported interest in culinary activities. Meyer, at 21. Activities that the Children do with Mother include cooking, going out to eat and playing board games. Id. F████ told Meyer that she does not like it when someone touches her possessions, such as when G████ touches them. Id. F████ said, "I freak out…cry…jump up and down." Id.

18

The Children said they had been grounded for fighting and had also lost phone and iPad privileges.

When Meyer saw G████ alone, G████ discussed a problem she had had at Father's house in which A███, S█████████'s daughter, yelled at her and would not let G████ take her Christmas presents back to Mother's house. Id. at 22. G████ said it is unfair that they treat A███ better and treat F███ better than her. Id. She told Meyer she does not like S███████'s children. G████ said that A███, S█████████, Father and sometimes D████ babysit her. Questioned regarding a fight that allegedly occurred at Father's house, G████ stated that T███ might have "accidentally" pushed her and that "he was drinking alcohol." Id. Asked about her interactions with babysitters at Father's house, G████ said, "I prefer not to talk about it." G████ said she may want to see Father a couple of times a year, but not on an extended vacation. Id.

Interviewed independently, F███ told Meyer she has an adequate relationship with S█████████'s children. F███ said she is usually at Father's house in the afternoon. She hangs out there with cousins or an uncle. Id. Occasionally, S█████████ watches her. F███ is not aware why G████ does not wish to visit Father. Asked about her relationship with G████, F███ said, "G████ pushes my buttons." Id. F███ said she would

19

like to live with Father week on/week off, so long as she is able to visit either parent when she wishes to if there were activities of interest.

At Father's house, F▮▮▮ said she enjoys going to petting zoos, fishing and visiting her grandmother and cousin. Id. F▮▮▮ is interested in being in the school marching band. Activities that G▮▮▮ enjoys with Father include playing games, fishing and softball. G▮▮▮ is a member of the color guard. Id. Meyer noted that F▮▮▮ might have some difficulties in expressive language.

Meyer said F▮▮▮ was in an expansive mood and was friendly at Father's. By contrast, G▮▮▮ was somewhat hesitant and wanted to leave. Both Children indicated that they had an adequate relationship with S▮▮▮▮. The Children see Paternal Grandmother at times. F▮▮▮ indicated that G▮▮▮ does not like Paternal Grandmother. Id. at 23.

When Meyer saw G▮▮▮ alone at Father's house, he asked her why she had not seen Father. She said, "I don't want to." G▮▮▮ feels that Father favors F▮▮▮ and gives her "better stuff." She also feels that she gets into trouble and gets yelled at because she and F▮▮▮ fight. G▮▮▮ feels that at Mother's house, she and F▮▮▮ are treated equally. G▮▮▮ feels that Mother is more fair and G▮▮▮ likes Mother more than

20



Father. Id. at 23.  G███ only wants to see Father a couple of times a year and on holidays. Id. at 23.

Interviewed separately, F███ said that she does not like it when L████, a fourth grader adopted by Paternal Grandmother, comes over to Father's house.  Other than that, F███ likes going to Father's house.  She characterized her relationship with S███████ as "OK."  She repeated her wish to live with Mother and Father week on/week off, with flexibility to go parties at Mother's house, like for birthdays and July 4th.  F███'s three wishes were that G███ not aggravate her, that she go to a week to week custody schedule "and still see parents," and that she win "a trillion dollars." Id. at 23.

Meyers noted in his report that the girls' therapist, Melissa McKee, recommended that the increase of F███'s time with Father be accomplished "gradually."  McKee believes that "a gradual transition will help all parties adjust and address any issues as they arise." McKee Correspondence, quoted in Meyer Report, at 19.  In a telephone follow-up on November 2, 2015, McKee told Meyer that the girls have made some progress on their relationship.  McKee said it is clear that G███ has anxiety relating to seeing Father and does not wish to visit him because of being left with other people.  G███ also indicated to McKee that she has concerns relating to Father's alcohol usage.  McKee



indicated that she had no safety concerns for F███ visiting Father. Id.

Meyer testified at trial regarding his written report. Although on page 5 of the report Meyer stated that Father was in denial of his substance abuse difficulty, Meyer admitted that he was not able to determine if Father in fact has a substance abuse problem. Meyer's testing of Father revealed no drug or alcohol issues.

Mother had indicated to Meyer that Father was a severe alcoholic. The Children did not say anything about the severity of Father's drinking, although G████ indicated that she had concerns.[3] Because Mother reported alcohol abuse by Father and the Children said there was alcohol use in Father's house by others, Meyer said, he recommended in his report that Father undergo a drug and alcohol evaluation as a precaution.

Father told Meyer he was depressed and had suicidal thoughts in 2009. He went to counseling and took Wellbutrin, but then stopped the therapy and the prescribed medication. Father did not tell Meyer why he stopped. Mother told Meyer Father quit both after a short time.

_____

[3] Meyer admitted he could not say that Mother reported many things that the Children did not support in their interviews with Meyer.

22


Mother told Meyer that someone had thrown G████ down the steps at Father's house. Meyer was also told that G████ had given what Meyer termed "a vague description of being sexually abused" at Father's. Meyer said the incident G████ had described "sounded like an incident of mild coercion" that did "not rise to the level of sexual abuse." G████ had described being held down while pictures were taken. When Meyer interviewed her, though, G████ denied she had been restrained.

Although Armstrong County's Children, Family and Youth Services labelled that accusation unfounded, G████ refused to go to Father's house after that. G████ said if she had to go to Father's house, she would kill him.

G████ refused to discuss the alleged sexual abuse with Meyer during their interview. When Meyer raised the subject, G████ "basically shut down." Meyer did not pursue the topic any further due to G████'s adverse reaction. G████'s reaction showed him that the incident was still an issue for her.

Meyer observed the Children at Father's house. He observed that F████ got along with Father's paramour "adequately." G████ obviously did not want to be there and wanted to leave. She was "reluctant to engage."

In his report, Meyer said:

23



[T]ere is no clear evidence that it would be detrimental for F███ to have an alternating one-week schedule with a mid-week afternoon visit, 4:00-8:00pm on opposing weeks. This schedule should be introduced gradually, initially with 5-2-2-5 schedule, which is essentially 50% for several months and, if that is effectual. Then moving to one week on and one week off for F███. In fact, she desires this schedule, with some flexibility as to participation in desired events during any opposing week. The parents should establish a holiday and vacation schedule for F███ with no longer than seven consecutive days away from either parent. In terms of G███ it appears that it would be detrimental for her to have increased contact with her father for various reasons. However, some type of visitation should be established which could include alternating specified holidays, with the meeting in a neutral environment. Short-term counseling between G███ and the father would be recommended to address issues as well as an attempt to normalize the relationship so that the specified visits can occur. Appointing a Guardian ad Litem for a short period of time may be helpful after initiation of the recommended schedules as a monitor to assure that the best interests of the children are being met.

Meyer Report, p. 26-27.

Asked why his recommendation that F███ and G███ have different schedules with Father is in the Children's best interests, Meyer responded that the Children have been on different schedules already, so his recommendation is just a continuation of the pattern during the last year.

Meyer said the problems between G███ and F███ are there whether or not they have different schedules with Father. He opined that the different schedules will not exacerbate the situation between the sisters. The issues the girls are having

24


are "pretty much sibling rivalry," Meyer said. "It's pretty intense." He said that is what the counseling is designed for. Meyer noted that the girls' counseling is ongoing and their counselor says they are making progress. He said it is absolutely necessary that F███ continue to participate in counseling with G███

F███ s counselor had no issues with F███ spending more time with Father. Meyer does not feel that safety at Father's house is an issue with either child, although he recognizes that G███ will suffer psychological injury if she is forced to go there. Meyer said that with respect to G███ he believes it is more of a dislike of Father than a safety issue for her.

Meyer admitted it is possible that F███ spending more time with Father could worsen the risk of problems between G███ and F███.

## DISCUSSION

"The paramount concern in a child custody case is the best interests of the child. A determination of the best interests of the child is based on consideration of all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being. The court, in determining a custody action, has the obligation to consider all

25



relevant factors that could affect the child's well-being."

*L.F.F. v. P.R.F.*, 828 A.2d 1148, 1152 (Pa. Super. 2003) (citations and quotation marks omitted).

Section 5328 of the Pennsylvania Child Custody Law, 23 Pa.C.S.A. § 5328(a), provides a list of the factors which the Court must consider in making a custody determination. We now address each factor separately below.

1. <u>Which party is more likely to encourage and permit frequent and continuing contact between the Children and the other party.</u> It is not clear that either party is more likely to encourage and permit frequent and continuing contact.

2. <u>The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the Children or an abused party and which party can better provide adequate physical safeguards and supervision of the Children.</u> Mother obtained a PFA against Father, but there is no indication as to whether there was an adjudication of Mother's charges or simply the entry of a consent PFA. In any event, the Court finds that there is no continued risk of harm to the Children or Mother from Father. The Court does find that Mother can better provide adequate physical safeguards and supervision of the Children. The Court finds that Father's choice of babysitters is at times questionable. It is disturbed

26



by G████'s allegations that the babysitters selected by Father consume alcohol while they are watching her.

3.  Consideration of the Children's abuse and involvement with protective services.  There is no evidence of any abuse.  Armstrong County CYFS investigated allegations that G████ was sexually abused at Father's house and decided they were unfounded.

4.  The parental duties performed by each party on behalf of the Children.  Mother has been Children's primary caregiver since the Children's birth.  Mother takes the Children to the doctor and dentist.  Father is involved in the Children's sports.

5.  The need for stability and continuity in the Children's education, family life and community life.  The Children have stability and continuity in all these areas.  However, G████ does not feel safe at Father's house when she is watched by people other than Father.

6.  The availability of extended family.  Both Mother and Father have extended family in the area.  Paternal Grandmother lives close to Father's house, as do two of his siblings.  They are available to do things for the Children if Father and S███████████ cannot.  Mother's parents also live in the area.

 
7.   <u>The Children's sibling relationships</u>.  "The
policy of this Commonwealth is that, where possible, siblings
should be raised together absent 'compelling reasons' to do
otherwise. *Watters v. Watters,* 757 A.2d 966, 969
(Pa.Super.2000).  However, this policy is a consideration in,
rather than a determinant of, custody arrangements. *Id.*  The
threshold for examining the meaning of compelling reasons is to
ask whether the evidence indicates that it was necessary to
separate the Children and whether the evidence was forceful in
this regard. *Id.*"  *L.F.F. v. P.R.F.,* 828 A.2d 1148, 1152-53 (Pa.
Super. 2003).

In this case, G[redacted] and F[redacted] have a highly
acrimonious relationship, although it is reportedly improving
with joint counseling and individual therapy for each girl.
There is strong evidence that whenever F[redacted] returns from
visiting Father's house by herself, she and G[redacted] get along
worse than ever.  For that reason, it is important to keep the
girls together as much as possible.  The Court feels it is not
in the Children's best interests to encourage disparate
treatment, as G[redacted] already feels that Father and S[redacted]
favor F[redacted] and S[redacted]'s daughter over her and this
perception helps fuel G[redacted]s animosity against F[redacted]

28

8. <u>The well-reasoned preference of the Children based upon the Children's maturity and judgment</u>. F████ who wants to live with Father half of the time, is not mature enough to make that decision. F████ has used the custody issue to get her way on more than one occasion, according to Mother. She should not be further encouraged to wield her choice of households as a weapon. G████ is more mature than F████. Her reasons for refusing to go to Father's house include the fact that Father and his paramour give F████ and A████ preferential treatment and that Father has left her with untrustworthy babysitters, leaving G████ feeling unsafe. Given G████'s somewhat fragile emotional state, these reasons suffice.

Mother has convinced the Court that the more time F████ spends with Father, the worse G████'s and F████'s relationship gets. As such, the Court does not agree with Meyer that F████ should work towards a shared custody arrangement.

9. <u>The attempts of a parent to turn the Children against the other parent</u>. There is credible evidence that Father and his paramour have tried to turn F████ against Mother by saying critical things about Mother to F████ and by inappropriately discussing the custody situation with F████

10. <u>Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the Children</u>

29


adequate for the Children's emotional needs. This factor favors Mother. Father lives with his paramour and her adult children. Mother indicated that the adult children have their own paramours living in Father's house as well. Meyer frequently used the word "adequate" to describe the relationship between S███████ and the Children, which is hardly a glowing recommendation. The Children seem to have lukewarm feelings about S███████. In addition, G████ is clearly uncomfortable with S███████'s daughter and the other people Father chooses to babysit for her. There appears to be cadre of young adults at Father's house who like to party while the Children are around. To the Court, this shows that Father has other priorities than creating a safe, welcoming environment for the Children.

11. Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the Children. Mother is more likely to do so. Mother has taken care of the Children's serious psychological and emotional needs in the face of Father's strong resistance to therapy and medication. In 2012, when Mother asked for help, Father actually told Mother that the Children's difficulties were not his problem.



12.  The proximity of the residences of the parties.
The parties live approximately five minutes apart.

13.  Each party's availability to care for the
Children or ability to make appropriate child care arrangements.
Both parties are available to care for the Children when they
are not working. The Court is not convinced that Father has the
ability to make appropriate child care arrangements when he is
not available.  Mother has that ability.

14.  The level of conflict between the parties and the
willingness and ability of the parties to cooperate with one
another.  The parties do not seem to like each other, but they
are willing and able to communicate via text messages.
According to Father, their level of conflict is currently low.

15.  The history of drug or alcohol abuse of a party
or member of a party's household.  Mother testified that Father
has a long history of abusing alcohol and has tried to stop
drinking many times.  Mother further testified that when Father
was drinking, he became hostile and angry.  The Court accepts
Mother's testimony as true.  The Court believes that Father has
an alcohol problem based upon his history of drinking and on the
Children's reports of drinking in Father's household.  G█████
particularly has expressed concern about Father's drinking.  The
fact that Father "passed" a drug and alcohol evaluation is not

31

significant, given that the evaluation was based on what Father told the evaluator. If Father chose to lie about his alcohol use, the evaluator would have no way of knowing that. There is no evidence that Mother or a member of either party's household has a history of drug or alcohol abuse.

16. <u>The mental and physical condition of a party or member of a party's household</u>. The record is devoid of either party or member of a party's household having a significant mental or physical health problem at this time.

17. <u>Any other relevant factor</u>. The Court finds Mother to be credible. By contrast, the Court finds that Father, who denies and minimizes problems at the expense of the Children, is not very credible. In addition, Father has not made the necessary changes to make G███ feel safe and loved when she is at Father's house. That would include eradicating any hint of favoritism toward E███ or Abby, finding different babysitters, and eliminating the consumption of alcohol when G███ and F███ are at Father's house. Father also did not start joint counseling with G███ until Meyer recommended it, even though it had been recommended before.

Moreover, Father presented absolutely no evidence regarding the extent of his involvement in the Children's education to date, although he wishes to have F███ every other



week and would be required to make sure she does her schoolwork and to help her with it should the Court award Father week on/week off custody of F████. By contrast, Mother indicated that she has had problems with unfinished homework when the Children were at Father's house.

Father does not have a good record of giving the Children their medication regularly. In addition, Father's persistent negative attitude towards psych medication and therapy has not been in the Children's best interest.

In summary, Father has failed to convince the Court that there is a good reason to change the current custody Order.[4] However, there are a number of good reasons to keep Father's partial physical custody the same. Instead of seeking fifty/fifty custody of F████, Father would be better served if he works on removing the impediments to having a good relationship with G████.

For all the above-stated reasons, the Court finds that it is in Children's best interests to live primarily with Mother.

An appropriate Order will be entered.

---

[4] F████'s desire to change to a fifty/fifty arrangement is not, in and of itself, a good reason.

IN THE COURT OF COMMON PLEAS OF ARMSTRONG COUNTY, PENNSYLVANIA

J██████ L. S████████, :
                    Plaintiff    :
                                 :
        v.                       :        No. 2011-1474-CIVIL
                                 :
R████ P. S████████,              :
                    Defendant    :

## ORDER

AND NOW, this ___3Rd___ day of May, 2016, it is ORDERED as follows:

1.    J██████ L. S████████ ("Mother") and R████ P. S████████ ("Father") shall have shared legal custody of G████ C. S████████ ("G████"), born June 6, 2002, and F████ A. S████████ ("F████"), born June 23, 2003, (collectively, the "Children"). Shared legal custody means the shared right to make major decisions on behalf of the Children, including, but not limited to, medical, religious and educational decisions. Both parties shall have access to the medical, dental, religious, and school records of the Children. Both parties shall have access to the same school records, school activities, and any school that the Children attend. Access to any records and information pertaining to the Children may not be denied solely based upon a party's physical custody schedule. The parties shall consult with each other with respect to the Children's education,

religious upbringing, medical care (except in emergencies), health, welfare, and other matters of similar importance affecting the Children, whose well-being, education, and development shall at all times be the paramount consideration of the parties. Each party shall notify the other party if the Children become seriously injured or ill, requiring emergency medical care and/or hospitalization, as soon as practicable. The parties shall at all times keep each other advised of residence address and telephone number changes.

2. Mother shall have primary physical custody of the Children.

3. When F████'s individual therapist indicates that F███ is ready, Father shall have partial physical custody of F████ as follows:

    a. Every other weekend from Friday at 5 p.m. until Sunday at 8 p.m.

    b. One weekday evening for a three-hour period each week.

    c. The parties shall share physical custody of F████ on the following holidays: New Year's Day, Easter, Memorial Day, Fourth of July, Labor Day, Thanksgiving, Christmas Eve and Christmas Day, with the specific times to be agreed upon between the parties. Father shall have F████ roughly an equal amount of time on the actual day of the holiday, unless otherwise agreed.

 
d. The parties shall share physical custody of F⬛⬛⬛ on each child's birthday, with the times to be agreed upon.

e. Mother shall have custody of F⬛⬛⬛ for Mother's Day and Father shall have custody of F⬛⬛⬛ for Father's Day.

4. When the therapist conducting Father and G⬛⬛⬛'s reunification and joint therapy sessions indicates that G⬛⬛⬛ is ready to spend time with Father, Father shall have partial physical custody of G⬛⬛⬛ as follows:

a. One weekday evening every other week for a three-hour period in a supervised neutral setting, such as Visit Coach House under the Holy Family Institute.

b. On some or all of the following holidays, depending on G⬛⬛⬛'s wishes: New Year's Day, Easter, Memorial Day, Fourth of July, Labor Day, Thanksgiving, Christmas Eve and Christmas Day, with the specific times to be agreed upon between the parties.

c. The parties shall share physical custody of G⬛⬛⬛ on each child's birthday, with the times to be agreed upon.

d. Mother shall have custody of G⬛⬛⬛ for Mother's Day and Father shall have custody of G⬛⬛⬛ for Father's Day.

5. Father shall be entitled to two non-consecutive weeks of uninterrupted physical custody of F⬛⬛⬛ during each calendar year for the purpose of taking G⬛⬛⬛ on an extended vacation should he desire to do so. Mother shall be entitled to

3


two non-consecutive weeks of uninterrupted physical custody of F████ and G████ during each calendar year for the purpose of taking them on an extended vacation should she desire to do so. The parties shall be free to agree to additional weeks of uninterrupted physical custody. Each party shall notify the other party no later than May 1st which weeks that party has selected for his or her vacation that calendar year. The parties shall alternate the right of first choice from year to year.

6. Mother and Father shall share transportation responsibilities equally, unless the parties otherwise agree.

7. Neither party will talk disparagingly, nor permit anyone else to talk disparagingly, about the other parent in the presence of the Children. There shall be no discussion of custody issues in front of the Children. The parties shall exert every reasonable effort to foster a feeling of affection between the Children and the other party. The Children shall never be used by one parent to spy or report on the other.

8. The parties shall keep each other informed of all organized activities and school functions in which a child is involved, as well as all parent-teacher conferences and other

school meetings. Mother shall promptly provide Father with the Children's report cards and other academic reports.

9. The parties shall communicate directly with each other regarding the Children and shall not use the Children to send messages back and forth between them. The parties shall use Family Wizard to communicate with each other. The cost of Family Wizard shall be shared equally.

10. The parties shall provide each other with liberal telephone access to the Children at all reasonable hours.

11. Father shall attend joint counseling with G████ for so long as G████'s individual therapist and the joint counseling therapist deem the joint counseling to be needed. G████ will not be expected to follow this Order's partial custody schedule until her individual therapist determines that she is psychologically able to do so.

12. Father shall ensure that no one in G████'s presence is physically intoxicated.

13. Nothing in this Order shall prevent the parties from making alternative custody arrangements, so long as they mutually agree. It is suggested that the parties memorialize any alternative arrangement in an e-mail or text so that there is no misunderstanding about what has been agreed to. If the parties do not agree, the terms of this Order shall be followed.

 
14. No party shall relocate the Children unless every individual who has custody rights to the Children consents to the proposed relocation or the Court approves the proposed relocation. Notice of the proposed relocation must be given and a counter-affidavit must be served on every individual who has custody rights to the Children as set forth at 23 Pa.C.S.A. § 5337. Relocation is defined as a change in a residence of the Children which significantly impairs the ability of the non-relocating party to exercise his or her custodial rights.

BY THE COURT:

_____, J.